UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEWYORK
-------------------------------------------------------x
MS FEDERAL ACQUISITION, LLC et al.,

    Plaintiffs,

    -v-                                                                                                 No. 14-CV-7794-LTS

U.S. BANK NAT'L ASS'N,

    Defendant.
-------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER

This case arises out of a dispute regarding the interpretation of certain agreements entered into by the parties. Plaintiffs MS Federal Acquisition, LLC ("MS Federal") GM Federal Acquisition, LLC ("GM Federal"), DG Federal Acquisition, LLC ("DG Federal"), GM Federal Acquisition, L.P. ("GM Federal LP") and HR Federal Acquisition, LLC ("HR Federal") (collectively, "Plaintiffs") bring this action against Defendant U.S. Bank National Association ("U.S. Bank" or "Defendant"), in its capacity as Trustee for LB-UBS Commercial Mortgage Trust 2007-C2, asserting claims for breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, declaratory judgment, and permanent injunction. The case was originally filed in state court and later removed to this Court. The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332.

Defendant moves to dismiss the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court has considered thoroughly all of the parties' submissions. For the following reasons, the motion is granted in part and denied in part.

<u>BACKGROUND</u>

The following facts are drawn from the Complaint and are presumed true for the purpose of this motion practice, unless otherwise noted.

On or about January 12, 2007, Plaintiffs borrowed money from Lehman Brothers Bank ("Lehman"). (Compl. ¶ 15.) The loan was secured by properties leased to FedEx (the "Properties"). The loan was thereafter sold by Lehman to LaSalle Bank National Association, as trustee for the LB-UBS Commercial Mortgage Trust 2007-C2 (the "Trust"), as part of a large volume pool of loans. (Id. ¶ 17.) The trustee of the Trust is U.S. Bank, the master servicer of the Trust is Wells Fargo Bank, National Association (the "Servicer"), and the current special servicer of the Trust is LNR Partners, Inc. ("LNR"). (Id. ¶ 22.)

Plaintiffs executed four security agreements (the "Security Agreements"), which are identical, at the time they obtained their loan from Lehman. (Compl. ¶¶ 15–16.) Each Security Agreement contains a provision that requires the Plaintiffs to implement a lockbox account into which rents generated by the Properties must be deposited if certain triggering events occur. (Kapoor Decl. Ex. B (Security Agreements, Section 4.4).)[1] Section 4.4 of each Security Agreement provides, in relevant part:

> <u>LOCK BOX ACCOUNT</u>. (a) upon the occurrence of an Event of Default, (ii) during any period that the Debt Service Coverage Ratio . . . shall be below 1.0:1.0 and Lender shall have notified Borrower of such fact and Lender's intention to implement the provision of this Section 4.4, or (iii) if a Dark Period . . . exists and

---

[1] Plaintiffs did not attach the Security Agreements or any of the correspondence referred to in the Complaint to that pleading. Defendant, however, has submitted the Security Agreements to the Court as attachments to a declaration. Because the Complaint's allegations make substantial reference to the Security Agreements, the Court treats the Security Agreements as incorporated by reference to the Complaint. A "district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint" in determining motion to dismiss for failure to state a claim. <u>DiFolco v. MSNBC Cable L.L.C.</u>, 622 F.3d 104, 111 (2d Cir. 2010).

>Lender shall have notified Borrower of such fact and Lender's intention to implement the provision of this Section 4.4, or (iv) if, on or before June 1, 2014, any of the tenants under any of the FedEx [sic] Leases . . . fail to renew the term of any of the Fedex [sic] Leases for an additional five (5) year term . . . or otherwise fails to renew any of the FedEx Leases on substantially similar economic terms, Borrower shall, from and after the next succeeding date of payment of an installment of principal and interest under the Note, deposit with Lender all Rents received by Borrower . . . .

(Id.)

In or about November 2013, the Plaintiffs contacted the loan servicer concerning their discussion regarding lease renewal with their tenant FedEx, and seeking clarification concerning the Servicer's interpretation and intent with respect to the lockbox provision. (Compl. ¶ 31.) Plaintiffs were "[i]nitially . . . advised" that the "Lockbox would be implemented only in the event of a default by the Plaintiffs . . . which was consistent with the Plaintiffs' interpretation."  (Id. ¶ 32.)  Later, the loan servicer "informed the Plaintiffs that the Lockbox would be implemented if the Plaintiffs did not meet certain requirements which the Servicer had established with respect to the leases for the Properties and the timing of Plaintiffs' ability to obtain extensions of those leases."  (Id. ¶ 34.)  Plaintiffs' representatives and the loan servicer discussed the manner in which the lockbox would be implemented and the maintenance of certain reserve accounts.  (Id. ¶ 35.)  Upon Plaintiffs' failure to secure lease renewals at their four properties, in June 2014, Defendant implemented a lockbox account into which Plaintiffs began depositing rent payments from their tenants.  (Id. ¶¶ 39-40.)

Under Exhibit B of the Security Agreements, "Lender shall make disbursements of funds . . . to reimburse Borrower for the cost of (i) tenant improvements required under any Lease . . ." (Kapoor Decl. Ex. B (Security Agreements, Ex. B, Section 3(b)).)  On or about January 31, 2014, the loan servicer "confirmed to the Plaintiffs that amounts invested in the" properties securing the loan "would be reimbursable to the Plaintiffs from the reserve accounts."

(Compl. ¶ 37.)  In or about June to July 2014, Plaintiffs submitted a request for reimbursement of approximately $137,000 from the reserve accounts for money Plaintiffs had spent on construction costs at one of the four properties securing its loan (the "Georgia property") in 2008.  (Id. ¶ 41.) On August 18, 2014, the Servicer denied Plaintiffs' request.  (Kapoor Decl. Ex. M.)

## DISCUSSION

In deciding a motion to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true the non-conclusory factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor.  Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007); see Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009).  The Court addresses each of the issues raised by the parties in turn.

Venable's Representation of Defendant

As a threshold matter, Plaintiffs claim that the law firm Venable cannot properly submit a motion to dismiss on behalf of Defendant U.S. Bank because Venable represents non-party LNR.  This argument is without merit.  Defendant has submitted documentation of the Limited Power of Attorney authority U.S. Bank has conferred on LNR and its counsel to litigate this matter.  (Kapoor Reply Decl. Ex. B.)

Breach of Contract Claims

  1. Implementation of the Lockbox Account

Plaintiffs assert that Defendant violated the terms of the contract by implementing a lockbox account in the absence of an event of default.  Whether the lockbox provision was properly implemented pursuant to the terms of the Security Agreements is a matter of contract interpretation. "Because contract interpretation is generally a question of law, it is suitable for

disposition on a motion to dismiss." Medtech Prods. Inc. v. Ranir, LLC, 596 F. Supp. 2d 778, 807 (S.D.N.Y. 2008) (internal quotation marks omitted). "Whether the contract is unambiguous is a question of law for the court." Continental Ins. Co. v. Atl. Cas. Ins. Co., 603 F.3d 169, 180 (2d Cir. 2010) (internal quotation marks omitted). "If the contract is unambiguous, its meaning is likewise a question of law for the court to decide." Napster, LLC v. Rounder Records Corp., 761 F. Supp. 2d 200, 206 (S.D.N.Y. 2011) (internal quotation marks omitted).  Under New York law, a contract is ambiguous if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted). "If the contract is unambiguous, that is, only susceptible to one reasonable interpretation, the court must give effect to the contract as written." Madeleine L.L.C. v. Street, 757 F. Supp. 2d 403, 405 (S.D.N.Y. 2010) (internal quotation marks omitted).

Here, the parties dispute (1) whether the lockbox provision could be triggered solely by Plaintiffs' failure to obtain lease renewals for the four properties securing their loan, without the occurrence of an event of a default; and (2) whether Plaintiffs are entitled to reimbursements from the lockbox account for construction expenses incurred in 2008.

The Court turns to the relevant provisions of the Security Agreements.  The first subsection of Section 4.4 of the Security Agreements provides:

> LOCK BOX  ACCOUNT. (a) upon the occurrence of an Event of Default, (ii) [sic] during any period that the Debt Service Coverage Ratio . . . shall be below 1.0:1.0 and Lender shall have notified Borrower of such fact and Lender's intention to implement the provision of this Section 4.4, or (iii) if a Dark Period . . . exists and Lender shall have notified Borrower of such fact and Lender's

> intention to implement the provision of this Section 4.4, or (iv) if, on or before June 1, 2014, any of the tenants under any of the FedEx Leases . . . fail to renew the term of any of the FedEx Leases for an additional five (5) year term . . . or otherwise fails to renew any of the FedEx Leases on substantially similar economic terms, Borrower shall, from and after the next succeeding date of payment of an installment of principal and interest under the Note, deposit with Lender all Rents received by Borrower . . . .

Security Agreements Section 4.4. Section 4.4(d) of the Security Agreements provides:

> If triggered by Section 4.4(a)(i)-(iii) above . . . the requirement to maintain the Lock-Box Account under this Section 4.4 shall terminate upon the cessation of the condition under 4.4(a)(i)-(iii) which gave rise to the requirement therefor, and the balance of the funds in the Lock-Box Account, if any, shall be returned to Borrower. If <u>triggered solely</u> by Section 4.4(a)(iv) above, and provided no event requirement the maintenance of the Lock-Box Account shall exist at the time, the requirement to maintain the Lock-Box Account under this Section 4.4 shall terminate upon the earliest to occur of (y) the exercise by each of the tenants under the Fedex [sic] Leases of the Fedex [sic] Renewal Option or the renewal of each of the FedEx Leases on substantially similar economic terms, or (z) a substitute tenant or tenants acceptable to Lender under one or more leases (each of which shall be acceptable to Lender) . . . .

(emphasis added).

The dispute apparently arises from a missing "(i)" following (a) and preceding "upon the occurrence of an Event of Default," in Section 4.4(a). Plaintiffs argue, citing the absence of "(i)" in the initial clause, that the lockbox provisions cannot be triggered in the absence of an Event of Default. Defendant responds that other references to the triggering of the lockbox provision in the absence of an event of default make clear that "upon the occurrence of an Event of Default" was only one of several conditions that could independently trigger the implementation of a lockbox.

The Court agrees with Defendant and finds that subsection 4.4(a), read in the context of section 4.4(d), provides unambiguously that failure to renew any of the relevant leases by June 1, 2014, constituted a triggering event independent of the occurrence of an Event of Default. Subsection 4.4(d) makes it clear that the parties intended the first sentence of

subsection 4.4(a) to identity three different, disjunctive predicates —"(i)–(iii)"; logically and grammatically, the "i" would have had to precede the reference to "Event of Default."  The second sentence of subsection 4.4(d), furthermore, specifically provides that the lockbox requirement can be "triggered solely" by Plaintiffs' failure to secure FedEx lease renewals.  See Security Agreements § 4.4(d) (referencing 4.4(a)(iv)).  The scrivener's error apparent in Section 4.4(a) does not render the provision ambiguous when considered in context.  The ambiguity of a provision must be judged in light of the terms of the contract viewed in its entirety.  Reading the contract in the manner suggested by Plaintiffs would be inconsistent with the second sentence of Section 4.4(d), quoted above, which indicates that four predicates were identified in Section 4.4(a).  The fact that Section 4.4(a) includes clauses "(ii)," "(iii)," and "(iv)" unquestionably indicates that the designation "(i)" was unintentionally omitted in connection with the reference to an Event of Default.  Plaintiffs' contention that the implementation of the lockbox account when Plaintiffs failed to obtain lease renewals constituted a breach of contract is thus plainly inconsistent with the unambiguous language of the Security Agreements and fails to state a claim.[2]

---

[2]  Plaintiffs allege that the Master Servicer misled them as to the legal effect of the provisions regarding the implementation of the lockbox account and the Leasing Account reserve. (Compl. ¶¶ 32–38, 42.) Defendant argues that, to the extent this is a claim that the Security Agreements were modified by conduct, the claim is precluded by Section 19.1 of the provision of the Security Agreement, which requires "an agreement in writing signed by the" party against whom the alleged modification is asserted. (Def. Br. Supp. at 12-13.)  Plaintiffs made no substantive response to this argument in their opposition to the motion and are thus deemed to have abandoned any claim of modification by conduct.

2. <u>Denial of Plaintiffs' Reimbursement Request</u>

The Court now turns to Plaintiffs' claim that Defendant breached the contract by denying their request to reimburse them for costs associated with a 2008 expansion on their property. Under the Replacement Reserve and Leasing Reserve Requirements (the "Reserve Requirement"), incorporated by reference into the Security Agreements, an escrow account (the "Reserve") is established consisting of two separate accounts. <u>See</u> Security Agreements Ex. B §§ 2–3. The Replacement Account is created as a reserve for certain capital expenditures of the Plaintiffs. <u>Id.</u> A Leasing Account is created as a reserve for Tenant Improvements and Lease Commissions. <u>Id.</u> Tenant Improvements are defined as "tenant improvements required under any Lease" in Section 3(b)(i) of the Reserve Requirements.

Under typical conditions, the Reserve is funded by a monthly deposit by the Plaintiffs. Pursuant to Section 6 of the Reserve Requirements, Defendant may require Plaintiffs to deposit additional amounts in the Reserve upon notice to the Plaintiffs that the Defendant has determined that the current balance is insufficient to cover certain anticipated future expenditures from the Reserve.

Pursuant to Section 3(b)(i) of the Reserve Requirements, provided no Event of Default exists, Defendant "shall make disbursements of funds in the Leasing Account to reimburse [Plaintiffs] for the cost of" Tenant Improvements. Disbursements are made after Plaintiffs provide a request for disbursement to the Defendant on a specified form. Disbursement requests cannot be made more frequently than quarterly or in amounts less than $5,000, but there is no express provision requiring Plaintiffs to request a disbursement within a certain amount of time after making the relevant expenditures.

The Reserve Requirements themselves do not reference the lockbox account provisions of the Security Agreements. However, the mechanism for funding the Reserve changes when the lockbox provisions have been triggered. Pursuant to Section 4.4(c) of the Security Agreements:

> Amounts on deposit in the Lock-Box Account on any date of payment of an installment of principal and interest under the Note shall be applied in the following order or priority: (i) to pay any Taxes, Other Charges, or Insurance Premiums then due and payable; (ii) to pay the Lock-Box Bank's fees; (iii) to pay interest and principal due on such date with respect to the Note; (iv) to replenish all reserves and escrow funds required to be paid by Borrower to Lender under the note, this Security Instrument and the other Loan Documents; (v) to pay normal and customary operating expenses of the Property which have been approved by Lender (which approval, if no Event of Default shall exist at the time, shall not be unreasonably withheld); and (vi) provided no Event of Default shall exist at the time, to the Leasing Account . . . .

As a result, if no Event of Default exists on each date of payment of an installment of principal and interest under a Note, then amounts on deposit in a lockbox account are applied for the various enumerated purposes with the remainder deposited in the Leasing Account.

Defendant argues that Plaintiffs fail to state a viable contract claim because they do not specifically allege facts demonstrating that the requested reimbursement is for "Tenant Improvements" as defined in the contract, that the agreement precludes this reimbursement while the lockbox is in effect, that the lengthy delay between Plaintiffs' expenditures and their request for reimbursement renders their request invalid, and that to read the agreement as permitting the reimbursement would be an absurdity. None of these arguments precludes Plaintiffs' theory of liability and Defendant's motion to dismiss this aspect of Plaintiffs' claim is therefore denied.

While the Complaint alleges that approximately $137,000 was "expended pursuant to an approved lease at the Athens Property" (Compl. ¶ 41) – not that Plaintiffs have paid for Tenant Improvements (i.e., tenant improvements <u>required</u> under a Lease) – Plaintiffs

have submitted, attached to the Complaint, their request for reimbursement, which indicates that the expenses were "Tenant Improvements." This is sufficient to put Defendant on notice that Plaintiffs assert that the expenses are ones covered by the reimbursement provision of the contract.

Furthermore, none of the contractual provisions referenced in Defendant's arguments unambiguously precludes reimbursement while a lockbox requirement is in effect. Section 3.11 of the Security Agreements relates to Plaintiffs' obligation to make timely payments to other parties so as to avoid encumbrances on the property not permitted by the agreements, and does not relate to either reimbursements from the Leasing Account or implementation of the lockbox account. Sections 4.4(a), (c) and (d), the core lockbox provisions, reference the Leasing Account only in identifying it as the location into which all residual funds will be periodically deposited. These provisions do not state that the ability of the Plaintiffs to receive disbursements from the Leasing Account will be in any way modified by the occurrence of a triggering event. Finally, Sections 3 and 6 of the Reserve Requirements make no reference to the lockbox provisions. Section 6, as described above, facially permits Defendant to require Plaintiffs to deposit additional amounts in the Reserve if the balance is insufficient to meet expected future expenditures.

In addition, no provision cited by Defendant sets forth a limitations period for submitting a request for reimbursement for "Tenant Improvements."

Viewing the facts alleged in the Complaint in the light most favorable to the Plaintiffs, the Court cannot draw the inferences Defendant urges and, as a result, Defendant's motion to dismiss, to the extent it relates to Plaintiffs' entitlement to reimbursements for the 2008 Tenant Improvements on its Georgia property, is denied.

Claim for Breach of the Implied Duty of Good Faith and Fair Dealing

Defendant argues that Plaintiff's claim for the breach of the implied duty of good faith and fair dealing must be dismissed, arguing that it is duplicative of the breach of contract claim.

Under New York law, every contract includes an implied duty of good faith and fair dealing, and "[e]ncompassed within the implied obligation of each promisor to exercise good faith are any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291, 87 N.Y.2d 384, 389 (N.Y. 1995) (citations and internal quotations omitted). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." Id. In determining whether a party has acted arbitrarily, courts often consider whether a party has exercised its contractual right of discretion malevolently or in bad faith in order to deprive other parties of the benefit of their bargain. See Serdarevic v. Centex Homes, LLC, 760 F. Supp. 2d 322, 333-34 (S.D.N.Y. 2010) (citing Richbell Info. Servs., Inc. v. Jupiter Partners, L.P., 765 N.Y.S.2d 575, 587 (App. Div. 1st Dep't 2003)).  However, a cause of action for breach of the implied duty of good faith and fair dealing will be dismissed as duplicative of a breach of contract claim when "both claims arise from the same facts and seek the identical damages for each alleged breach." Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce, 894 N.Y.S.2d 47, 49–50 (App. Div. 1st Dep't 2010) (internal citation omitted).

Here, Plaintiffs' claim for breach of the implied duty of good faith and fair dealing arises from the same facts as their breach of contract claim, aside from a conclusory

allegation of bad faith. As a result, Plaintiffs' claim for breach of the implied duty of good faith and fair dealing is dismissed as duplicative of the breach of contract claim.

Promissory Estoppel Claim

In order to state a claim of promissory estoppel under New York Law, a plaintiff must allege: (1) a clear unambiguous promise; (2) reasonable and foreseeable reliance by the promisee; and (3) unconscionable injury suffered by the relying party. HealthNow New York, Inc. v. APS Healthcare Bethesda, Inc., No. 1:05CV612(FJS/RFT), 2006 WL 659518, at *7 (N.D.N.Y. March 10 2006) (citing New York case law).

Plaintiffs have alleged generally that they were promised (1) that the lockbox provision would be triggered only in the event of a default (Compl. ¶¶ 31-32) and (2) that Plaintiffs could obtain reimbursement of past expenses. (Id. ¶¶ 37, 51.)

Plaintiffs have attempted to supplement their bare, conclusory allegations with e-mail exchanges, which are provided in declarations accompanying their opposition papers. (Chopp Decl., Ex. A; Guttman Decl.) Even if the Court could properly consider these documents in connection with this motion practice, the documents themselves set forth no clear or unambiguous promises regarding contractual interpretation or reimbursements were made: an attachment of a letter in draft form, dated January 24, 2014, from the loan servicer to Plaintiffs, indicates that Defendant interpreted the failure of Plaintiffs' to obtain lease renewals on their properties as an independent basis for triggering the lockbox provision, and furthermore, makes no reference to the 2008 construction costs on the Georgia property for which Plaintiffs seek reimbursement. See Guttman Decl. Ex. F; Chopp Decl. Ex. A.

Because none of Plaintiffs' allegations support an inference that a clear and unambiguous promise regarding interpretation of the lockbox provision or reimbursement related

to the 2008 construction on the Georgia property was made to them, the Court must dismiss Plaintiffs' promissory estoppel claim.

Claims for Declaratory Relief

Plaintiffs have asserted claims for declaratory relief that are largely duplicative of their claims for breach of contract.  This Circuit evaluates claims for declaratory relief based on five factors: (1) whether the judgment "will serve a useful purpose in clarifying or settling the legal issues involved"; (2) whether the judgment will finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or as a race to res judicata; (4) whether the use of a declaratory judgment will increase friction between sovereign legal systems; and (5) whether there is a better or more effective remedy.  Dow Jones & Inc. v. Harrods, Ltd., 346 F.3d 357, 359-60 (2d Cir. 2003).  The Court finds that the declaratory relief sought by the Plaintiffs would not serve a useful purpose in clarifying or settling the legal issues involved in this case.  The legal issues will be resolved by litigation of the breach of contract claims.  See Intellectual Capital Partner v. Institutional Credit Partners LLC, No. 08 Civ. 10580 (DC), 2009 WL 1974392, at *6 (S.D.N.Y. July 8, 2009).  Consequently, the claims for declaratory relief are dismissed.

Claim for Injunctive Relief

Plaintiffs have additionally asserted a claim for permanent injunctive relief.  To obtain a permanent injunction, a party seeking such relief must demonstrate, among other things, that "'it has suffered an irreparable injury'."  World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp., 694 F.3d 155, 160-61 (2d Cir. 2012) (quoting eBay Inc. v. MercExchange, L.L.C.,

547 U.S. 388, 391 (2006)). Plaintiffs' Complaint contains no allegation that would support a finding of irreparable harm. Their claim for injunctive relief is, accordingly, dismissed.

Plaintiffs' Request for Leave to Amend

In their opposition to Defendant's Motion to Dismiss, Plaintiffs request leave to file an Amended Complaint. At the time Defendant's motion was filed, paragraph A.2.b(iii) of the Individual Practice Rules of the undersigned provided[3]:

> Within seven (7) days after a motion pursuant to Rule 12(b)(6) or 12(c) is filed, the non-moving party must make, by letter delivered to Chambers and copied to all parties via fax or hand delivery, any request for leave to amend (further) in response to the motion or state that it will file its opposition to the motion without further amendment. If no letter is submitted to the Court within seven (7) days, the motion will be briefed in accordance with Local Civil Rule 6.1. If leave to amend is requested, briefing on the motion is stayed pending the Court's resolution of the request. No further opportunity to amend the challenged pleading in light of arguments raised in the motion will be granted, whether or not the nonmoving party seeks leave to amend in response to the motion.

Plaintiffs did not request leave to amend within seven days after the motion was filed, and the request included in their opposition papers is therefore untimely. Accordingly, Plaintiffs' request for leave to further amend the Complaint is denied.

---

[3] The rule has since been updated to reflect changes in ECF filing procedures.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the complaint is granted in part and denied in part. The initial pre-trial conference in this action is scheduled for September 11, 2015, at 10:15 a.m. The parties must consult and submit a joint statement in advance of the conference, in accordance with the Initial Conference Order (docket entry no. 7).

This Memorandum Order resolves docket entry number 10.

SO ORDERED.

Dated: New York, New York
      July 21, 2015

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge